UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JESSICA EHLERS,                                   Case No. 18-CV-2794 (PJS/TNL)

                    Plaintiff,

v.                                                              ORDER

UNIVERSITY OF MINNESOTA,

                    Defendant.

---

Michael A. Fondungallah, FONDUNGALLAH & KIGHAM, LLC, for plaintiff.

Brent P. Benrud and Carrie Ryan Gallia, UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL COUNSEL, for defendant.

In November 2012, plaintiff Jessica Ehlers began working for Boynton Health Service ("Boynton"), the campus healthcare system operated by defendant the University of Minnesota ("the University"). About 17 months later, Ehlers was diagnosed with temporomandibular joint disorder ("TMJ"), a jaw disorder that causes severe pain in her jaw, face, and neck, and limits her ability to speak and eat. Ehlers's TMJ symptoms worsened after she was transferred to a different position within Boynton. In response to her worsening symptoms, Ehlers took Family and Medical Leave Act ("FMLA") leave, requested and received many accommodations, and eventually went on full-time, non-FMLA leave. Ehlers was terminated in April 2017, while still on leave.

After filing two charges of discrimination with the Equal Employment

Opportunity Commission ("EEOC") and receiving a Notice of Right to Sue, Ehlers filed

this lawsuit against the University.  She alleges that the University violated the

Americans with Disabilities Act ("ADA") in three ways:  by failing to provide

reasonable accommodation of her disability, by discriminating against her on the basis

of her disability, and by retaliating against her for engaging in protected conduct.

This matter is before the Court on the parties' cross-motions for summary

judgment.  ECF Nos. 61, 80.  For the reasons that follow, the Court grants the

University's motion and denies Ehlers's motion.

## I.  BACKGROUND

### A.  Ehlers's First Position at Boynton and TMJ Diagnosis

Ehlers began working at Boynton in November 2012 as the Assistant to the

Director of Nursing.  Benrud Decl. Ex. 1.  Ehlers provided general administrative

support, maintained departmental records and payroll, tracked schedules, and

performed data analysis.  *Id.*; Fondungallah Decl. Ex. 1, Ehlers Dep. II 23:17–27:20.[1]

Ehlers did well in this position and received excellent performance appraisals.

Fondungallah Decl. Ex. 3.

---

[1]All citations use ECF page numbers, except citations to depositions, which use
the page numbers of the deposition transcript.

In the summer of 2013, Ehlers had surgery to remove her lower wisdom teeth. Ehlers Dep. II 43:15–21.  Following the surgery, Ehlers experienced severe, persistent pain in her jaw.  *Id.* at 50:18–22.  Ehlers was diagnosed with TMJ on April 15, 2014, although it is not clear whether the TMJ was related to the wisdom-teeth extraction.[2] Fondungallah Decl. Ex. 4.  About one year after Ehlers's TMJ diagnosis, Ehlers met with her supervisor, Deborah Carlson, to discuss the impact of Ehlers's TMJ on her ability to speak.  Benrud Decl. Ex. 2.  Carlson recommended that Ehlers file a request for accommodation with the University's Disability Resource Center ("DRC").  The DRC handles requests for workplace accommodations and provides other services to employees and students with disabilities.  Fuecker Decl. ¶ 3.  Carlson explained that filing a request for accommodation with the DRC would enable Ehlers to obtain accommodations that had been recommended by Ehlers's doctor, such as breaks from speaking throughout the work day.  Benrud Decl. Ex. 2.

Following her meeting with Carlson, Ehlers also met with Carl Anderson, the Chief Operating Officer of Boynton, and Hosea Ojwang, Boynton's Human Resources Director, to inform them of her TMJ and to seek non-speaking breaks as an

---

[2]The cause of Ehlers's TMJ is unclear.  In her deposition, Ehlers testified that she was not sure what caused her TMJ, but that it developed after her wisdom-teeth extraction.  Ehlers Dep. II 42:22–24.  But Ehlers told her expert witness, Dr. James Fricton, that "the TMJ problem occurred as a result of her hostile work environment that caused her to clench her teeth."  Fondungallah Decl. Ex. 53, at 44.

accommodation.  Anderson Decl. ¶ 2; Ojwang Decl. ¶ 2; Benrud Decl. Exs. 3, 4.  Ojwang told Ehlers that she did not need to file a formal request for accommodation with the DRC; instead, she could simply take breaks from speaking as needed during the workday.  Benrud Decl. Ex. 3, at 17.  Based on this advice, Ehlers did not make a formal request for accommodation.  Ehlers Dep. II 65:7–16.

Ehlers was informally accommodated, just as Ojwang had promised.  Carlson allowed Ehlers to take non-speaking breaks when Ehlers needed them, ensured that Ehlers had her own office space, and allowed Ehlers to close her office door.  Benrud Decl. Ex. 8.

## B.  Ehlers's Transfer

Ehlers's relationship with Carlson later soured for reasons that were unrelated to Ehlers's disability and accommodations.  An anonymous complaint was lodged against Carlson, alleging that she had been impaired by alcohol while at work, and Carlson suspected that Ehlers had filed it.[3]  *Id.* Ex. 9, Ehlers Dep. 65:17–21, 66:12–13.  Ehlers disclosed to her doctor, Dr. Robert Koch, that "[Carlson] had been under some sort of investigation for alcohol abuse and their relationship became very intense and [Ehlers] requested to be moved to a job without that supervisor."  *Id.* Ex. 7, at 41.  Ojwang testified that Ehlers's relationship with Carlson had deteriorated to the point that Ehlers

---

[3]As far as the Court can determine, Ehlers has neither admitted nor denied filing this complaint.

visited his office "every day" to complain about Carlson.  Fondungallah Decl. Ex. 54,

Ojwang Dep. 39:20–40:10.  Ojwang concluded that Ehlers could no longer work for

Carlson and should be transferred to a different department.  *Id.* at 50:9–25.

What happened next is disputed.  Ojwang testified that he informed Ehlers of

three open positions at Boynton—one in the information technology office ("IT"), one in

the finance department, and one in the Office of Student Health Benefits

("OSHB")—and that he invited Ehlers to choose among them.  *Id.*  All three positions

were in the 1885 job classification, the same as Ehlers's current position.  *Id.*; Benrud

Decl. Ex. 1.  According to Ojwang, Ehlers was uninterested in the positions in IT and

finance, and she selected the OSHB position after speaking with the person who would

be her supervisor.  Ojwang Dep. at 51:1–8.

By contrast, Ehlers testified that "[t]here was no conversation" between Ojwang

and her about the transfer.  Ehlers Dep. II 74:3.  Ehlers explained that she "objected to

being transferred to another position because [she] wasn't aware of any position at

Boynton . . . that was open or even that wouldn't entail being [in] a call center."  *Id.*

at 73:5–9.  Ehlers also noted that, just days before her transfer, she filed a Healthcare

Insurance Portability and Accountability Act ("HIPAA") complaint after a nurse

discovered that a label with patient information had been left in an exam room.  *Id.*

at 67:6–72:15.  Ehlers believed that she was transferred to OSHB in retaliation for filing

this HIPAA complaint.  *Id.* at 72:15–73:17.

On October 7, 2015, Ojwang emailed Ehlers stating that she was being reassigned

to OSHB.  Fondungallah Decl. Ex. 10.  Ojwang testified that, immediately after her

transfer, Ehlers told Ojwang that she was satisfied with her new position, but later she

began complaining.  Ojwang Dep. 54:2–9.  By contrast, Ehlers testified that she

immediately complained about her transfer to OSHB, which she dubbed a "call center."

Ehlers Dep. II 73:5–9.  Ehlers accused the University of transferring her in retaliation for

a "health and safety complaint"—by which Ehlers appeared to mean the anonymous

complaint accusing Carlson of being impaired at work.  Benrud Decl. Ex. 8.  (As noted,

Ehlers has also accused the University of transferring her in retaliation for her making a

HIPAA complaint.)  On November 7, 2015, Ehlers filed a complaint with the Minnesota

Department of Labor and Industry, alleging that her transfer to OSHB was

discriminatory and retaliatory under the Occupational Safety and Health Act ("OSHA")

and Minnesota law.[4]  Ehlers Dep. 65:17–21; Fondungallah Decl. Ex. 12.

---

[4]The OSHA complaint is not in the record, but Ehlers confirmed at the hearing
that it related to her transfer to OSHB.  Ehlers eventually withdrew the OSHA
complaint, and the matter was closed on February 26, 2016.  Fondungallah Decl. Ex. 12.

### C. The OSHB Position

At OSHB, Ehlers worked as an Executive Office & Administrative Specialist; as
noted, she remained in the 1885 job classification. Benrud Decl. Ex. 12. On her first day
at OSHB, Ehlers informed Sue Jackson, the Director of OSHB, that she had TMJ. Ehlers
Dep. II 74:24–75:4. Ehlers's initial conversation with Jackson led Ehlers to believe that
she would not have to engage in excessive speaking in her new position. *Id.*
at 74:24–75:12. But Jackson told Ehlers that Katherine Perszyk[5] would be her supervisor
and that Perszyk (not Jackson) would be responsible for Ehlers's day-to-day
assignments. *Id.* at 75:11–12.

Ehlers's duties at OSHB ended up being substantially different from those that
she had performed while working for Carlson. Her primary function at OSHB was to
answer phone calls from students, parents, and staff about their insurance plans.
Benrud Decl. Exs. 12, 25. Conversations with callers could last up to 45 minutes, with
breaks ranging from 10 to 30 seconds in between calls. Fondungallah Decl. Exs. 15, 29.
Ehlers also performed some non-speaking work at OSHB (such as data entry and
analysis), but the vast majority of her time was spent speaking on the phone. Benrud
Decl. Exs. 12, 25. Needless to say, the OSHB position was particularly ill-suited for

---

[5]Katherine Perszyk has since changed her name to Katherine Siqueiros. *See*
Siqueiros Decl.

Ehlers in light of her TMJ and its impact on her ability to speak.  *See id*. Ex. 7 (discussing

worsening of Ehlers's TMJ symptoms following her transfer to OSHB).

### D.  FMLA Leave and First Request for Reasonable Accommodation

The significant amount of speaking required in her new job took a toll on Ehlers.

By the summer of 2016, Ehlers was in constant pain, throwing up, and unable to eat.

Ehlers Dep. II 84:18–85:17.  Ehlers lost a significant amount of weight and even feared

for her life.  *Id*.  In June 2016, Ehlers contacted the DRC, seeking assistance with her

disability; David Fuecker, a Disabilities Specialist at the DRC, invited Ehlers to schedule

a meeting to discuss the registration process.  Benrud Decl. Ex. 15; Fuecker Decl. ¶ 2.

On July 19, 2016, Ehlers requested FMLA leave, and her request explained that,

after she returned from leave, she would need a reduced schedule.  Specifically, Ehlers

said that, once or twice per week, her workday would have to be limited to four hours,

and she would need additional time off when she experienced a flare-up or she had to

go to a medical appointment.  Benrud Decl. Ex. 16.  The University approved Ehlers's

request for FMLA leave and agreed to provide her with a reduced schedule and time off

for flare-ups and appointments.  *Id*. Ex. 18.

The doctor's note attached to Ehlers's FMLA request recommended three

additional accommodations:  (1) reduce the need for her to speak constantly; (2) provide

non-speaking breaks, either every other hour or 15 minutes of each hour, during which

-8-

she could perform non-speaking work; and (3) reassign her to a different job. *Id.* Ex. 17.

The leave request and accompanying doctor's note were the first medical documents

that Ehlers submitted to the University about her disability, as well as the first

documents provided to the University that indicated that Ehlers needed an

accommodation at OSHB. Fuecker Decl. ¶ 5.

On August 15, 2016, Ehlers emailed Ojwang and attached a formal request for

accommodation. Benrud Decl. Ex. 8. Based on her doctor's advice, Ehlers sought non-

speaking work for 15 minutes of each hour or every other hour and non-speaking work

for 15 minutes before her lunch break—or, if that were not possible, reassignment to a

different job that would provide these accommodations. *Id.* Ex. 21. Ehlers also met

with Fuecker to discuss her accommodation request, and she sent him a follow-up

email on August 19, 2016, providing additional information about her position and

suggesting changes to OSHB's call-distribution technology. Fondungallah Decl. Ex. 15.

Ehlers began her six weeks of FMLA leave on August 22, 2016. Benrud Decl.

Ex. 18. While Ehlers was on leave, the University evaluated her request for

accommodation. Fondungallah Decl. Exs. 16, 17. The University requested additional

medical information and, in response, Ehlers submitted a letter from Dr. Koch on

September 22, 2016. In that letter, Dr. Koch wrote that Ehlers's speech "[r]estrictions are

expected to be permanent" and that he was "not aware of any technology that would

replace Jessica using her voice."  Benrud Decl. Ex. 19.  Ehlers submitted an additional

letter from Dr. Koch on September 27, 2016; in that letter, Dr. Koch again recommended

non-speaking breaks or reassignment to a different job "with little to standard speaking

instead of high volume speaking required in a call center."  *Id.* Ex. 20.

      In a letter dated September 28, 2016, Anderson denied Ehlers's request for

accommodation.  *Id.* Ex. 21.  Anderson explained that Ehlers's OSHB position was a

customer-service job that required extensive interaction with customers and therefore

"cannot be restructured to a non-speaking or reduced speaking position."  *Id.*

Anderson also stated that Boynton did not have any open positions that would meet

Ehlers's medical restrictions, and Anderson referred Ehlers to the DRC to explore

transferring to a position outside of Boynton.  *Id.*

      After receiving Anderson's letter, Ehlers called Fuecker to discuss her options.

*Id.* Ex. 22.  Fuecker suggested that Ehlers participate in the DRC's Job Transfer Process,[6]

a program that helps individuals with disabilities find new jobs at the University, gives

them hiring priority within their job classification, and provides them with health

insurance and other benefits.  *Id.* Ex. 69; Binsfeld Decl. ¶ 3.  Ehlers declined to

participate in the program, though, after she learned that doing so would require her to

---

      [6]This is also referred to as the Job Transfer Program.  *See* Benrud Decl. Ex. 55.

quit her current job at Boynton.  Benrud Decl. Ex. 22.  The call concluded after Fuecker

suggested setting up a meeting.  *Id.*

### E.  Return from FMLA Leave

Ehlers returned from FMLA leave on October 3, 2016.  Although the University

rejected Ehlers's request for non-speaking breaks, the University implemented the

accommodations that Ehlers had sought when she filed her FMLA leave request:

a reduced schedule, time off for flare-ups, and time off for medical appointments.  *Id.*

Ex. 18; Ojwang Decl. ¶ 5.  Before long, though, Ehlers began complaining about two

new things:

First, Ehlers contended that she had been given a new position after she returned

from FMLA leave, and she complained about that "reassignment" to the human-

resources department on multiple occasions.  Fondungallah Decl. Ex. 22, at 37.  Ehlers

retained the same title, the same classification number, the same supervisor, and the

same pay and benefits, but Ehlers argued that her duties had changed, and therefore

she had not been restored to the same position.  Ojwang Decl. ¶ 5; Ehlers Dep. II

93:15–21, 113:8–114:1.

At Ojwang's request, Ehlers and her attorney created a document comparing her

duties before she took FMLA leave to her duties after she returned from FMLA leave.

Benrud Decl. Ex. 25, at 107–10.  The duties were quite similar.  Ehlers described her pre-

FMLA-leave duties as:  (1) being second in line to assist walk-in customers;

(2) answering phone calls (which she described as her "[p]rimary function"); (3) data

entry and analysis for the Residents, Fellows, and Interns ("RFI") Benefit Programs; and

(4) covering the duties of K. Talmadge, a former employee.  *Id.* at 108.  Ehlers described

her post-FMLA-leave duties as:  (1) being second-to-last in line to assist walk-in

customers; (2) answering phone calls (which she described as her "[p]rimary function");

(3) data entry and analysis for the RFI Benefit Programs; (4) covering the duties of

K. Talmadge; and (5) data entry and analysis for the Graduate Assistant Health Plan

("GAHP") accounts.  *Id.*  Ehlers also noted that some of the non-speaking work she

performed before taking leave was now being performed by other OSHB employees.

The University investigated Ehlers's complaints, noted that the duties of her

position fluctuated somewhat throughout the year, and concluded that Ehlers had been

returned to the same position.  *Id.* Ex. 27, at 118.  Although Ehlers continued to

complain about her changed duties, the University deemed the matter closed after it

finished its investigation.  *Id.*

Second, Ehlers began complaining about the fact that six employees at OSHB had

been reclassified into higher-level positions while Ehlers was on leave.  Ehlers Dep. II

114:2–7; Ojwang Decl. ¶ 6.  The six reclassified employees had different job titles and

different job classifications from Ehlers.[7]  Siqueiros Decl. II ¶¶ 3–5.  The reclassified

employees also had different job duties from Ehlers, including handling more complex

customer inquiries, educating students and staff, and processing enrollment and

termination documents.  *Id.* ¶ 6.  Ehlers nevertheless took offense to not being

reclassified because some of the things that she did—such as answering phone calls

from customers—were the same as some of the things that the reclassified employees

did.  *Id.*; Ehlers Dep. II 115:1–25.

### F.  Relay Service and Non-Speaking Breaks

On October 14, 2016, Ehlers met with Brent Benrud (Senior Associate General

Counsel for the University), Anderson, Ojwang, Fuecker, Brittany Bullock (Ehlers's

union steward), and Marshall Tanick (one of Ehlers's attorneys[8]) to discuss the

accommodations that had been denied while Ehlers was on FMLA leave—specifically,

her request for non-speaking breaks or transfer to a position that would require her to

---

[7]The job classifications and titles of the six employees are unclear from the
record.  Siqueiros declared that the reclassified employees were either Executive
Accounts Specialists (job classification 1888) or Principal Accounts Specialists (job
classification 1858).  Siqueiros Decl. II ¶¶ 3, 5.  However, in its answer to Ehlers's
request for admissions, the University stated that the reclassified employees were either
Executive Accounts Specialists (job classification 1888) or Program/Project Specialists
(job classification 1897).  Fondungallah Decl. Ex. 23, at 47.

[8]Ehlers has been represented by several attorneys in connection with her dispute
with the University.  Marshall Tanick and Teresa Ayling represented her initially; they
were replaced by David R. Forro; and Forro was replaced by Michael A. Fondungallah.

speak less.  Benrud Decl. Ex. 24.  At the meeting, Ehlers informed the University that a

relay service would reduce her need for speaking, while still allowing her to respond to

customer inquiries.  *Id.*  A relay service would work like this:  If a caller wanted to speak

with Ehlers, the caller would call the relay service and be connected to an agent.  The

agent would then contact Ehlers.  The caller would speak to the agent, who would type

the message to Ehlers.  Ehlers would type her response, and the agent would read that

response to the caller.  Fuecker Decl. ¶ 7.  At the close of the meeting, the University

agreed to investigate the feasibility of adopting a relay service.  Benrud Decl. Ex. 24.

The University's IT and Networking and Telecommunications Services ("NTS")

offices investigated two different relay services—even consulting directly with

representatives from each relay service—but ultimately determined that neither relay

service was compatible with Boynton's phone system.[9]  *Id.* Ex. 26; Fuecker Decl. ¶ 8.  On

November 22, 2016, the University informed Ehlers that using a relay service was not

feasible.  Benrud Decl. Ex. 27, at 117.  The University said, however, that it would

voluntarily implement non-speaking breaks on a trial basis; Ehlers would be allowed to

---

[9]The IT and NTS offices determined that a relay service would not work for calls
to OSHB.  Benrud Decl. Exs. 27, 29.  In order for a relay service to work, the customer
must know that the OSHB employee with whom she will be communicating needs to
use a relay service, and the customer must call the *relay service* (not OSHB); the relay
service then joins the OSHB employee to the call.  But Boynton's phone system used one
customer-service number; customers called that number and their calls were routed
through a queue to the next available OSHB employee.  *Id.* Ex. 26.  Thus, a customer
calling OSHB has no way of knowing to whom she will be connected.

take a 15-minute break from speaking to perform non-speaking work if she had

engaged in 45 minutes of continuous speaking.  *Id.*  This trial accommodation was

confirmed after Ehlers met with Perszyk and Staci Samson, an Access Consultant at the

DRC.  *Id.* Ex. 28; Samson Decl. ¶ 2.

### G.  Issues with Ehlers's Trial Non-Speaking Breaks

Shortly after this meeting, Ehlers began to complain that the trial accommodation

was not sufficient and argued that Dr. Koch had recommended a 15-minute non-

speaking break each hour, even if Ehlers had done little or no speaking during that

hour.  In letters dated December 7 and 9, 2016, the University disagreed with Ehlers's

interpretation of Dr. Koch's most recent note, and stated that Ehlers would need to

submit an updated doctor's note in order to receive the requested change to the

accommodation.  Benrud Decl. Ex. 29.

Ehlers also complained that she had not been reassigned to an open position at

Boynton in November 2016.  *Id.* at 125–26.  The University responded that it was

unaware of her interest in the position—and that, in any event, it was a customer-

service position requiring extensive speaking.  The University again reminded Ehlers

that she could participate in the DRC's Job Transfer Process.  The University also

invited Ehlers to notify the University when she became aware of an open position that

interested her, and the University would then work with Ehlers's union to facilitate a transfer to that position. *Id.*

Ehlers's next complaint came on December 7, 2016, when she told Samson that her non-speaking breaks were being interrupted. *Id.* Ex. 30, at 2; *see also id.* Ex. 35 (restating Ehlers's concerns about her breaks in a December 13, 2016 letter). Samson proposed several solutions that Ehlers could implement during her breaks, including putting her phone on "wrap,"[10] ignoring incoming calls, turning down her phone's ringer, not answering calls a minute or two before a break, and placing a sign on her desk during non-speaking breaks. *Id.* Exs. 30, 31. Ehlers testified that her supervisor (Perszyk) objected to many of these proposals and continued to interfere with Ehlers's non-speaking breaks. Ehlers Dep. II 135:20–139:1.

On December 12, 2016, Ehlers provided a new letter from Dr. Koch that added to her medical restrictions. Benrud Decl. Ex. 33. The letter recommended: (1) reducing the constant need for speaking; (2) scheduling a 15-minute non-speaking break into each hour, or providing non-speaking work every other hour; (3) taking additional non-speaking breaks as needed; (4) maintaining Ehlers's entire lunch period; (5) using a phone that could manage and record her break times; and (6) reassigning Ehlers to a

---

[10]Putting her phone on "wrap" would mean that Ehlers's phone would not receive any calls routed from the central customer-service phone number. Benrud Decl. Ex. 30. Ehlers would still receive calls made to her direct line. *Id.*

different job that required less speaking.  *Id.*  The following day, the University agreed to schedule 15-minute non-speaking breaks into each hour, but only on a temporary basis while it evaluated long-term solutions.  *Id.* Ex. 34.  The University also promised to investigate new phones and reiterated its offer to help Ehlers find a different job.  *Id.*

On December 14, 2016, Ehlers met with Samson and Perszyk, and they scheduled a 15-minute non-speaking break into each hour of the work day, consistent with Dr. Koch's recommendation.  *Id.* Ex. 36.  Ehlers was also allowed to take additional breaks as necessary, so long as Ehlers kept a record of those additional breaks.  *Id.*

Ehlers then started complaining about having to keep track of her additional breaks.  She told the University that having to keep track of her additional breaks increased her stress, and she complained that employees who were not disabled did not have to keep track of their breaks.  *Id.* Ex. 35.  The University told Ehlers that she was required to keep track of her breaks for "basic workplace management" reasons.  *Id.* Ex. 31.  Ehlers asked that the University give her a special phone that would track her breaks; the University told her to use pen and paper.  *Id.* Ex. 37.

Ehlers continued to complain that the University was not fully implementing Dr. Koch's recommended accommodations.  The University asked Ehlers to provide more information.  *Id.* Ex. 31.  Ehlers responded by filing a charge with the EEOC on December 20, 2016; in her charge, Ehlers accused the University of discrimination,

failing to provide reasonable accommodations, harassment, and retaliation.

Fondungallah Decl. Ex. 31.

### H.  Ergonomic Evaluation and Equipment

Dr. Koch wrote an updated letter on January 18, 2017—and, once again, his list of recommended accommodations grew.  Benrud Decl. Ex. 38.  Dr. Koch now recommended the following accommodations:  (1) reducing the constant need for speaking; (2) scheduling a 15-minute non-speaking break into each hour, or providing non-speaking work every other hour; (3) taking additional non-speaking breaks as needed; (4) maintaining Ehlers's entire lunch period; (5) using a phone that could manage and record her break times; (6) reassigning Ehlers to a different job that required less speaking; (7) providing an ergonomic evaluation of Ehlers's workstation, including her chair and monitor; (8) avoiding technologies controlled by facial and eye movements; (9) allowing Ehlers to minimize facial expressions; and (10) creating a quiet work environment.  *Id.*  Ehlers submitted Dr. Koch's letter to Samson, and Ehlers told Samson that her TMJ specialist had further recommended using a moist heat wrap on her shoulders and neck and cold packs on her jaws, and that would require the University to supply Ehlers with a microwave oven and freezer.  *Id.* Ex. 39, at 40. Samson recommended that the University buy a small microwave oven and freezer to

-18-

place under Ehlers's desk, and Samson scheduled an ergonomic evaluation of Ehlers's workstation. *Id.*

On January 26, 2017, Neil Carlson completed an ergonomic evaluation of Ehlers's workstation with Ehlers and Samson, and afterwards they visited an ergonomics showroom to pick out new ergonomic equipment for Ehlers. *Id.* Ex. 40. Following this meeting, Samson ordered a number of items for Ehlers, including a desk chair, a sit-stand desk, a monitor mount, a document holder, a footrest, a mouse pad, an adjustable height bulletin board, and a longer phone cord. Samson also offered to order a second computer monitor, a neck pillow, a back rest, a telephone stand, and a post-it-note holder. *Id.* Exs. 40, 43, 44, 46; Samson Decl. Ex. A, at 67, 84.

Delivery of some of these items was delayed, but Ehlers received her new desk chair on January 30, 2017. Benrud Decl. Ex. 41. The monitor mount, document holder, footrest, mouse pad, bulletin board, and lengthened phone cord were all installed by March 23, 2017. *Id.* Ex. 46; Samson Decl. Ex. A, at 67. Ehlers testified that she never received the sit-stand desk, but internal correspondence from the University indicates that it too was installed by March 23, 2017. *Compare* Ehlers Dep. II 166:6–8, *with* Benrud Decl. Ex. 46.

Ehlers began to complain about the new equipment.  In response, the University

sent experts to adjust the equipment.  *See* Benrud Decl. Ex. 43; Samson Decl. Ex. A, at 73,

83, 87.

### *I. Text-to-Speech Software*

The University also began exploring text-to-speech[11] ("TTS") software as a

potential long-term accommodation of Ehlers.  Benrud Decl. Exs. 47, 48.  TTS software

works as follows:  Ehlers downloads the TTS software and connects her phone to her

computer.  A caller dials Boynton's customer-service number, is routed to Ehlers's

phone, and speaks directly to Ehlers.  Ehlers types her response, and the computer

vocalizes Ehlers's typed response to the caller.  Fuecker Decl. ¶ 9.  In January 2017, the

University determined that the TTS software was compatible with Boynton's phone

system.  Benrud Decl. Ex. 47; Samson Decl. Ex. A, at 10.

The University believed that the TTS software would enable Ehlers to remain in

her position at OSHB.  Fondungallah Decl. Exs. 34, 36.  On February 15, 2017, Benrud

emailed Teresa Ayling (another of Ehlers's attorneys) to inform her that the University

was ready "to start rolling out" the TTS software.  Benrud Decl. Ex. 37, at 32.  Benrud

asked Ayling how Ehlers would like to proceed.  On February 16, 2017, Samson emailed

Ehlers, asking to schedule a demonstration of the TTS software.  *Id.* Ex. 48.

---

[11]This is also referred to as "type-to-speech" and "type-to-talk" software.  *See, e.g.*, Benrud Decl. Ex. 37; Fondungallah Decl. Ex. 34.

From the beginning, however, Ehlers made clear that she was not interested in using TTS software.  Ehlers complained to Samson that the TTS software may "exacerbate" Ehlers's TMJ, and Ehlers said that Dr. Koch did not want Ehlers "using text to speech software extensively to avoid repetitive stress injuries."  *Id.* at 65.  These were curious complaints, given that three months earlier Ehlers had asked the University to hire a relay service, and the TTS software would require the same amount of typing as the relay service.  The University expressed concern that Ehlers was rejecting the TTS software without even trying it, but Ehlers's attorney assured the University that that was not the case.  *Id.* at 63.

That was, in fact, the case.  Notwithstanding the assurances of her attorney, Ehlers continued to resist use of the TTS software without even trying it.  Ehlers privately told her union representative that she was afraid that the TTS software would give her carpal tunnel syndrome.  *Id.* Ex. 60.  Ehlers also informed Perszyk on March 16, 2017 that using the TTS software would result in overuse injuries and that "constant typing has [already] led to injuries."  *Id.* Ex. 57, at 95.  This concern was reiterated in an email from Ehlers's attorney to Benrud, in which Ehlers's attorney wrote that "[Ehlers] and her doctor remain concerned that more time spent typing could aggravate her hand pain and forearm and elbow tendonitis."  *Id.* Ex. 58.

Ehlers also told Samson that she was worried that the TTS software would require her to use eye or facial movements, thereby exacerbating her TMJ. *Id.* Ex. 48, at 65. The University investigated this concern and determined that the TTS software could be set up to rely solely on typing and not on facial movements. *Id.* at 64. In addition, the University found out that the TTS software could store commonly used phrases, thereby reducing the amount of typing required. *Id.*

Ehlers nevertheless delayed the software demonstration again and again. *Id.* Exs. 52, 54, 57. The demonstration eventually took place, but Ehlers never personally used the TTS software. Ehlers Dep. II 186:14–16. She was unwilling to even give it a try.

*J. Updated Doctor's Notes*

On March 1, 2017, Ehlers submitted an updated doctor's note from Dr. Koch. Benrud Decl. Ex. 49. Once again, Dr. Koch added to his list of recommended accommodations. This time Dr. Koch recommended: (1) reducing the constant need for speaking; (2) reducing speaking intervals to every other hour; (3) conducting an ergonomic evaluation of her workstation; (4) creating a quiet work environment; (5) providing time off for medical appointments and therapies once or twice each week; (6) avoiding devices controlled by eye or facial movements; (7) minimizing facial expressions; (8) reassigning Ehlers to a different job that required no more than four

hours of speaking per day; (9) imposing a lifting restriction of 20 pounds; and

(10) arranging for an occupational medicine consultation.  *Id.*

In response, the University agreed to allow Ehlers to alternate speaking and non-speaking hours until the TTS software was implemented, but the University said that it would not pay Ehlers for the non-speaking hours because it did not have sufficient non-speaking work to keep her busy during those hours.  *Id.* Ex. 50.  The University also repeated its oft-repeated invitation to Ehlers to visit the job center and explore the possibility of transferring to an open position outside of Boynton.  *Id.*

On March 14, 2017, Ehlers's attorney sent the University a report of work ability (dated March 8, 2017).  That report informed the University—for the first time—that Ehlers not only suffered from TMJ, but now had been diagnosed with tendonitis, bilateral hand pain, and several other maladies.  *Id.* Ex. 54.  The University responded to this updated medical information on March 15, 2017, reiterating that the non-speaking accommodations were temporary and would remain in place only until March 20, 2017, after which Ehlers would be expected to use the TTS software and return to her full-time schedule.  *Id.* Ex. 55.  The University noted that the medical documentation did not identify any new work restrictions, and therefore did not change these plans.  *Id.*

### K. Requests for Reassignment

As noted, Ehlers and her doctor repeatedly asked that Ehlers be assigned to a different position that required less speaking. *See, e.g., id.* Exs. 17, 20, 33, 38, 49, 63, 67. In response to these requests, the University consistently made four points:

First, the University told Ehlers that it was not legally required to reassign her to a new position if she could be accommodated in her current position. *See, e.g., id.* Exs. 29, 51, 55.

Second, the University repeatedly invited Ehlers to participate in the DRC's Job Transfer Process, which she repeatedly declined to do. *Id.* Exs. 22, 29.

Third, the University promised to assist Ehlers with finding a new job if she notified the University of open positions that interested her and if her transfer to those positions would not violate the University's collective bargaining agreement with Ehlers's union. *Id.* Exs. 29, 34, 37. The University also offered to work with Ehlers's union to facilitate an expedited transfer if she found an open position that would meet all of her restrictions. *Id.* Exs. 37, 55.

Finally, the University offered to coordinate a visit to the job center during which Ehlers would be accompanied by a DRC employee. *Id.* Ex. 34. After Ehlers's relationship with Samson soured, the University attempted to facilitate the job-center visit by appointing Mark Sevenich as Ehlers's human-resources contact and Jesse Vega

as Ehlers's job-center contact. *Id.* Exs. 50, 51. But Ehlers never did visit the job center. Ehlers Dep. II 173:15–174:15.

In March 2017, Ehlers finally identified four or five open positions that interested her. Fondungallah Decl. Ex. 39; Benrud Decl. Ex. 55. Ehlers and her attorney drafted a questionnaire to collect information about the open positions, and the University forwarded the questionnaire to the hiring supervisors. Fondungallah Decl. Exs. 40, 41. Two of the positions had been filled by the time Ehlers's questionnaire was submitted. *Id.* Ex. 41. One of the hiring supervisors returned Ehlers's questionnaire in April 2017. *Id.* Her responses indicated that the position—Executive Office & Administrative Specialist in the Anesthesiology Administration Unit—was not suitable for Ehlers, as it was "[f]orward facing" and required daily verbal communication, lifting during event set up, working in a loud environment, and a "lot" of typing. *Id.* at 12–14.

### L. Second Medical Leave and Termination

On March 21, 2017, Dr. Koch recommended that Ehlers take a three-week leave of absence followed by reduced hours for five weeks. Benrud Decl. Exs. 62, 63. Dr. Koch wrote that Ehlers had complained that the additional typing required by the TTS software "aggravates her other conditions." *Id.* Ex. 62, at 112. This was a curious statement, as Ehlers had never *used* the TTS software. Ehlers Dep. II 185:18–19 ("I never got to use the software."); *id.* 186:15–16 ("I never personally used the software. I saw a

demo of it at the general counsel's office.")  Dr. Koch concluded that Ehlers "has two major contributors to her work pain[,] . . . typing and talking[,] and this position is going to involve either one."  Benrud Decl. Ex. 62, at 113.  By this point, Ehlers had exhausted her FMLA leave.  *Id.* Ex. 64.  Ehlers requested full-time, unpaid non-FMLA leave from March 22, 2017 until April 12, 2017, followed by a reduced schedule.  *Id.* Exs. 63–65.  The University granted her request.  *Id.* Ex. 66.

On April 5, 2017—while Ehlers was still on unpaid leave—her attorney submitted an updated doctor's note, which recommended that Ehlers's three-week leave be extended by another five weeks (to May 26, 2017).  *Id.* Ex. 67.  The University rejected this request and terminated Ehlers's employment in a letter dated April 17, 2017.  *Id.* Ex. 68.  In the termination letter, Ojwang explained that Ehlers was terminated because of excessive absenteeism; Ojwang pointed out that it had been 30 weeks since she had worked her full schedule.  *Id.*; *see also* Fondungallah Decl. Ex. 46 (listing "Absence" as the reason for termination); Ojwang Dep. 100:1–101:20.

### M.  *Post-Termination Doctor's Note and Job Transfer Process*

Ehlers's termination did not end her relationship with the University.  The day after she was terminated, Ehlers received a letter from the DRC, once again inviting her to participate in the Job Transfer Process.  Benrud Decl. Ex. 69.  Ehlers finally agreed to do so, *id.* Ex. 70, and she was placed on the job-transfer list effective April 21, 2017, *id.*

Ex. 71.  Ehlers did not immediately receive information about the Job Transfer Process, but in May 2017, an Access Consultant named Neal Binsfeld was assigned to work with Ehlers.  *Id.* Ex. 73; Binsfeld Decl. ¶¶ 2, 4.  Ehlers and Binsfeld met on June 29, 2017 to discuss Ehlers's interests and restrictions.  Benrud Decl. Ex. 78; Binsfeld Decl. ¶ 4.

In the meantime, Dr. Koch opined that Ehlers would be unable to work—even part-time—until July 17, 2017, extending what was initially intended as a three-week leave into a four-month leave.  Benrud Decl. Ex. 76.  On June 29, 2017, Dr. Koch issued a report of work ability and another list of recommended accommodations—a list that had now grown from three (when Ehlers first sought accommodations in the fall of 2016) to sixteen:  (1) balancing speaking and typing; (2) reducing speaking intervals to every other hour; (3) providing appropriate ergonomics; (4) creating a calm work setting; (5) minimizing distractions; (6) facilitating sound absorption; (7) providing a flexible work schedule; (8) providing audio-recorded training sessions or written training materials; (9) allowing for reduced work processing time to account for special software and repetitive stress monitoring software; (10) providing a reduced schedule of four hours per day, which would increase over time; (11) allowing use of warm and cold packs; (12) allowing time for Ehlers to eat her meals slowly; (13) providing time off for medical appointments each week; (14) avoiding devices controlled by eye or facial

movements; (15) allowing Ehlers to minimize facial expressions; and (16) honoring a lifting restriction of 20 pounds. *Id.* Ex. 77.

By the end of August 2017, Ehlers had applied for many jobs at the University but had not been given any interviews. *Id.* Ex. 80. According to the University, Ehlers had not alerted the DRC or the job center that she was applying for these positions, and thus Ehlers did not receive the preferential treatment that is normally given to participants in the Job Transfer Process. *Id.* Ex. 81. On September 8, 2018, Ehlers received an email from Susan Cable-Morrison, a human-resources professional, explaining how to effectively participate in the Job Transfer Process. *Id.* Ex. 82.

On September 18, 2017, Ehlers filed a second charge of discrimination with the EEOC. Fondungallah Decl. Ex. 49. After the EEOC issued a Notice of Right to Sue, *id.* Ex. 52, Ehlers filed this lawsuit.

## II. ANALYSIS

### A. Standard of Review

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a fact is "genuine" only if

-28-

"the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

### B.  Actionable Time Period

Before turning to the merits, the Court needs to identify the actionable time period for Ehlers's claims.  The parties agree that Ehlers was required to file a charge of discrimination with the EEOC within 300 days of the discriminatory conduct.  42 U.S.C. § 2000e-5(e)(1); *see Alexander v. Chrysler Motors*, 564 F. App'x 274, 274 (8th Cir. 2014) (per curiam).  Ehlers filed charges with the EEOC on December 20, 2016 and September 18, 2017, which creates an actionable time period of February 24, 2016 (300 days prior to Ehlers's first EEOC charge) to September 18, 2017 (the date of the second EEOC charge). Fondungallah Decl. Exs. 31, 49.

Ehlers does not dispute this calculation.  Instead, she argues that the Court can consider conduct that occurred prior to February 24, 2016—including her October 2015 transfer to OSHB—under the continuing-violation doctrine.  Pl.'s Mem. Supp. Summ. J. 31.  The continuing-violation doctrine allows a court to consider discriminatory conduct that occurred before the beginning of the limitations period when that conduct was part of a pattern of conduct that continued uninterrupted into the limitations period, thereby creating a single unlawful employment practice.  *See Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 117–18 (2002) (discussing continuing-violation doctrine in the context of Title VII hostile-work-environment claims); *Treanor v. MCI Telecomms. Corp.*, 200 F.3d 570, 573–74 (8th Cir. 2000) (considering applicability of continuing-violation doctrine to claim brought under the Minnesota Human Rights Act); *E.E.O.C. v. Fed. Express Corp.*, 165 F. Supp. 2d 956, 961 (D. Minn. 2001) (applying continuing-violation doctrine to ADA claims).  The continuing-violation doctrine is often applied to hostile-environment claims.  *Morgan*, 536 U.S. at 113–15.

But "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."  *Id.* at 113.  Discrete acts "are easy to identify" and include termination, failure to promote, denial of transfer, or refusal to hire.  *Id.* at 114.  An involuntary transfer also falls within this category.  *See Miller v. Stifel, Nicolaus & Co.*, 812 F. Supp. 2d 975, 985 (D. Minn. 2011) ("[F]ailures to promote, discriminatory pay, job transfers, and unfavorable assignments are discrete acts that cannot form the basis of a continuing violation claim[.]" (cleaned up) (quotation and citation omitted)); *Usala v. Consol. Edison Co. of N.Y.*, 141 F. Supp. 2d 373, 379–80 (S.D.N.Y. 2001) (holding an employee's transfer was a discrete act not subject to the continuing-violations doctrine).

Ehlers was transferred to OSHB in October 2015.  From almost the moment she was transferred, she complained that the transfer was unlawful retaliation—either for

-30-

filing the anonymous complaint accusing her supervisor of being impaired at work or

for filing a HIPAA complaint about a patient's information being left in an exam room.

In November 2015, Ehlers filed a complaint with the Minnesota Department of Labor in

which she alleged that her transfer was unlawful.  It was not until months later—the

summer of 2016—that Ehlers started to complain about the University's alleged failure

to accommodate her disability and other conduct that is the subject of this lawsuit.

In short, Ehlers's transfer to OSHB was a discrete event, and it had no connection

to the allegedly unlawful conduct that Ehlers claims to have experienced at OSHB

during the limitations period.  The continuing-violation doctrine does not apply, and

therefore neither Ehlers's October 2015 transfer to OSHB nor anything else that

occurred before February 24, 2016 is actionable.

### C. Reasonable Accommodation

Ehlers was employed throughout most of the actionable period as an Executive

Office & Administrative Specialist at OSHB.  Ehlers claims that, while she was working

at OSHB, the University failed to reasonably accommodate her disability.

At times in her complaint and briefs, Ehlers describes this claim rather broadly,

but at oral argument she conceded what should be obvious to anyone familiar with the

facts:  The OSHB position was fundamentally unsuitable for Ehlers.  The predominant

function of the position was to communicate with customers, preferably by doing a lot

of talking, but in the alternative by doing a lot of typing.  Ehlers could do neither.  No

accommodation of any sort would have allowed her to perform the essential function of

her position.  And thus—as Ehlers agreed at oral argument—her reasonable-

accommodation claim boils down to a claim that the University failed to reasonably

accommodate her by transferring her to another position.  It is to that claim that the

Court now turns.

### 1. Modified Burden-Shifting Analysis

"[A] claim against an employer for failing to reasonably accommodate a disabled

employee does not turn on the employer's intent or actual motive."  *Peebles v. Potter*, 354

F.3d 761, 766 (8th Cir. 2004).  Rather, "[i]n a reasonable accommodation case, the

'discrimination' is framed in terms of the failure to fulfill an affirmative duty—the

failure to reasonably accommodate the disabled individual's limitations."  *Id.* at 767.

Consequently, a court weighing a summary-judgment motion in a reasonable-

accommodation case does not apply the familiar *McDonnell Douglas* framework.

Instead, the court must apply a "modified burden-shifting analysis."  *Fenney v. Dakota,*

*Minn. & E. R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003) (footnote omitted).

Under that modified burden-shifting analysis, the plaintiff must first make a

facial showing that she (1) has a disability, (2) suffered an adverse employment action,

and (3) is a qualified individual.  *Id.*  To show that she is a qualified individual, a

plaintiff must demonstrate that she possesses the "requisite skill, education, experience, and training for her position" and that she can "perform the essential job functions, with or without reasonable accommodation." *Heaser v. Toro Co.*, 247 F.3d 826, 830 (8th Cir. 2001), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011). If the employer contests the plaintiff's ability to perform the essential functions of the job, the burden shifts to the employer to produce evidence of those essential job functions. *Fenney*, 327 F.3d at 712.

If the employee cannot perform the essential job functions without an accommodation, she must "make a 'facial showing that a reasonable accommodation is *possible*.'" *Id.* (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)). The burden then shifts to the employer to show that it cannot accommodate the employee or that the employee cannot perform the position's essential functions even with accommodation. *Id.* The plaintiff can rebut this showing with evidence of her individual capabilities. *Id.* At all times, the plaintiff "retains the burden of persuading the trier of fact that [she] has been the victim of illegal discrimination due to [her] disability." *Benson*, 62 F.3d at 1112.

The parties do not dispute that Ehlers has a disability, that her April 17, 2017 termination was an adverse employment action, or that she possessed the requisite education and skills for her OSHB position. The parties also do not dispute that Ehlers

-33-

was not capable of performing the essential function of her OSHB position without an

accommodation.  The issue, then, is whether any accommodation would have enabled

Ehlers to perform the essential function of her OSHB position: answering customer

inquiries about insurance plans.  Benrud Decl. Ex. 25 (describing answering customer

phone calls as Ehlers's "[p]rimary function").

As noted, Ehlers conceded at the hearing—and the Court would find even in the

absence of her concession—that she was unable to "perform the essential job functions

[of her OSHB position], with or without reasonable accommodation."  *Heaser*, 247 F.3d

at 830.  Thus, the only accommodation that the University might have been required to

provide was reassignment to a different position.

Reassignment is "'an accommodation of last resort,'" which is required of an

employer only "when the employee cannot be accommodated in [her] existing

position."  *Minnihan v. Mediacom Commc'ns Corp.*, 779 F.3d 803, 814 (8th Cir. 2015)

(citation omitted).  There are several additional limitations on an employer's duty to

reassign under the ADA:  First, reassignment is required only if there is an existing,

vacant position; the employer does not have to create a new position or terminate an

employee to open up an existing position.  *Id.*; *see also Fjellestad v. Pizza Hut of Am., Inc.*,

188 F.3d 944, 950–51 (8th Cir. 1999).  Second, the employee must be qualified for the

vacant position, meaning that she "(1) satisfies the legitimate prerequisites for that

alternative position; and (2) is able to perform the essential functions of that position with or without reasonable accommodation." *Johnson v. Otter Tail County*, No. Civ.A. 98-2237(RLE), 2000 WL 1229854, at *7 (D. Minn. July 24, 2000), *aff'd*, 2001 WL 664217 (8th Cir. June 14, 2001) (unpublished table decision); *see also Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 941 (8th Cir. 2018). Third, an employer is not required to reassign the employee when doing so would violate a legitimate nondiscriminatory policy, *Huber v. Wal-Mart Stores, Inc.*, 486 F.3d 480, 483–84 (8th Cir. 2007), or a collective bargaining agreement, *Benson*, 62 F.3d at 1114.

"Of course, it is the [p]laintiff who 'bears the burden of showing that a vacant position exists and that the plaintiff is qualified for that position.'" *Johnson*, 2000 WL 1229854, at *7 (quoting *Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 595 (7th Cir. 1999)); *see also Fjellestad*, 188 F.3d at 950–51 (noting burden shifted to employer to show accommodation through reassignment was not possible only after employee identified a vacant position for which she was qualified); *Benson*, 62 F.3d at 1114–15 (same); *cf. Rehrs v. Iams Co.*, 486 F.3d 353, 359 (8th Cir. 2007) (noting that when a reasonable-accommodation claim is based on the employer offering an inadequate reassignment position, the employee must introduce evidence "that a comparable position for which the employee was qualified, was open" (quotation and citation omitted)).

2.  Failure to Reassign

One of the challenges that the University faced in trying to accommodate Ehlers was that she kept moving the goal posts.  In August 2016, Ehlers presented one medical problem (TMJ) and sought a relatively straightforward accommodation of that problem (non-speaking work for 15 minutes of each hour or every other hour and non-speaking work for 15 minutes before her lunch break—or, if that were not possible, reassignment to a different job that would require less speaking).  Benrud Decl. Ex. 21.  Over the ensuing months, Ehlers's doctor kept adding to his list of recommended restrictions.  Prior to March 2017, though, neither Ehlers nor her doctor ever informed the University that there was any limit on her ability to type.  To the contrary, in October 2016 Ehlers asked the University to accommodate her by hiring a relay service—an arrangement that would have required her to type all day every day.

Prior to March 2017, then, the University acted reasonably in trying to accommodate Ehlers in her existing position and, in particular, in concluding that Ehlers could be accommodated with the TTS software.  The University had no reason to believe that Ehlers could not replace speaking with typing because she had never notified the University of any problem with her hands or wrists and, as noted, she herself had recently asked to reduce her speaking by increasing her typing.  In short, prior to March 2017, the University reasonably concluded that it could accommodate Ehlers in her position at OSHB with the TTS software, and thus the University had no

obligation to reassign her during this period.  *See Minnihan*, 779 F.3d at 814 (reassigning an employee is required only when employee cannot be accommodated in current position).

After the University settled on the TTS software as a long-term accommodation, Ehlers for the first time informed the University that she had been diagnosed with tendonitis and bilateral hand pain and thus could not do a substantial amount of typing.  Benrud Decl. Exs. 57, 62, 63.  Only at that point—in March 2017—should it have become clear to the University that Ehlers could not be accommodated in her OSHB position.  Reassignment then became the only option.

That is not the end of the story, however.  In order to recover under the ADA for the University's failure to reassign her, Ehlers must prove that there was a vacant position for which she was qualified and whose essential functions she could perform—with or without reasonable accommodation—despite her long list of medical restrictions.  In other words, to avoid summary judgment, Ehlers must point to evidence in the record that in or after March 2017, a position opened at the University and that (1) the position did not require a lot of talking; (2) the position did not require a lot of typing; (3) the position would allow her to avoid speaking altogether every other hour; (4) the position would not require her to make much use of facial expressions; (5) the new work setting would be quiet and calm and provide few distractions;

(6) Ehlers could work a reduced and flexible schedule, taking a lot of time off for

medical appointments and flare-ups; (7) Ehlers could take time during the day to apply

warm and cold packs and to eat her meals slowly; and (8) Ehlers would not be required

to lift more than 20 pounds.

Common sense suggests that there are few positions for which Ehlers would be

qualified and that would be compatible with her long list of medical restrictions.  And,

not surprisingly, Ehlers has not provided evidence that any such position was open at

the University in or after March 2017.

On March 16, 2017, Ehlers sent to Sevenich and Vega an email that identified

several positions in which she was interested.[12]  Benrud Decl. II Ex. 91, at 7.  Ehlers

listed the job ID numbers[13] of four positions, which she described as "non-union

positions, which appear to be clerical or related."  *Id.*  But because there is no other

information about these positions in the record, a reasonable jury could not conclude

---

[12]Ehlers also identified a vacant position in November 2016.  Benrud Decl. Ex. 29.
But this position cannot satisfy Ehlers's burden for two reasons:  First, this opening
arose before the University was legally obligated to reassign Ehlers.  And second, this
opening was for a customer-service job requiring extensive speaking.  *Id.*

[13]Ehlers's email lists the following information for the positions:  (1) Job ID:
316116, Location: Twin Cities; (2) Job ID: 316073, Location: Other—See Job Description;
(3) Job ID: 316010, Location: Twin Cities; and (4) Job ID: 315354, Location: Twin Cities.
Benrud Decl. II Ex. 91, at 7.

that Ehlers was qualified for any of them, much less that she could perform the essential

functions of those positions in light of her many medical restrictions.

The record does contain sufficient information to assess one of the positions in

which Ehlers expressed interest: an opening for an Executive Office & Administrative

Specialist in the Anesthesiology Administration Unit.[14]  Fondungallah Decl. Ex. 41.  The

hiring supervisor's response to Ehlers's questionnaire stated that the position was

forward facing, required daily verbal communication, required lifting during event set

up, took place in a loud work environment, had only limited flexibility for time off for

medical appointments, required a great deal of typing, and was high stress.  *Id.*  Ehlers

was a complete mismatch for the position.

Having independently reviewed the record, the Court cannot find evidence of a

single position at the University that was open, that Ehlers was qualified for, and whose

essential functions Ehlers could have performed (with or without reasonable

accommodation) in light of her numerous medical restrictions.  For that reason, the

Court holds that the ADA imposed no duty on the University to accommodate Ehlers

by reassigning her to another position.  *See Faidley*, 889 F.3d at 941 ("The ADA did not

require [the employer] to offer [the employee] a position for which [she] was

---

[14]This position carried the Job ID 315845.  Fondungallah Decl. Ex. 41.

unqualified.").[15]  The Court therefore grants summary judgment to the University on

Ehlers's reasonable-accommodation claim.

### 3.  Abandoned Claims

As the Court has noted, Ehlers clarified at oral argument that the only

reasonable-accommodation claim that she is pursuing is the claim that the University

had a duty to reassign her.  Out of an abundance of caution, however, the Court will

devote a few words to some of the other reasonable-accommodation arguments that

Ehlers made in her briefs but (wisely) abandoned at oral argument.

Ehlers's brief largely focuses on Anderson's letter of September 28, 2016.  Benrud

Decl. Ex. 21.  In that letter, Anderson denied Ehlers's request for accommodation,

explaining that Ehlers's OSHB position was a customer-service job that required

extensive interaction with customers and therefore "cannot be restructured to a non-

speaking or reduced speaking position."  *Id.*  Anderson also explained that Boynton did

not have any open positions that would meet Ehlers's medical restrictions, and

Anderson referred Ehlers to the DRC to explore transferring to a position outside of

Boynton.  *Id.*  Ehlers argues in her brief that Anderson's letter evidences both a failure to

---

[15]Ehlers argues that the University did not do enough to assist her in finding a
suitable open position.  But it is Ehlers's burden—not the University's—to identify a
vacant position for which she was qualified.  *See Johnson*, 2000 WL 1229854, at *7.  Ehlers
also argues that the University had a duty to create a new position to accommodate her.
That is not the law.  *See Minnihan*, 779 F.3d at 814; *Fjellestad*, 188 F.3d at 950.

accommodate and a failure to engage in the interactive process.  Ehlers is wrong on both points.

As to the duty to accommodate:  Anderson's letter cannot be viewed in isolation. Both before and after Anderson sent his letter, the University took numerous steps to accommodate Ehlers's disability.  Before Anderson sent his letter, the University had approved FMLA leave, granted Ehlers's request for a reduced schedule upon her return from FMLA leave, and agreed to give her time off for appointments and flare-ups.  *See Id.* Ex. 18; Ojwang Decl. ¶ 5.  After Anderson sent his letter, the University approved Ehlers's taking non-speech breaks after 45 minutes of speaking, and then approved Ehlers's scheduling 15-minute non-speaking breaks into each hour, and then approved Ehlers's proposal for a one-hour-on, one-hour-off schedule.  The University also allowed Ehlers to take additional self-scheduled non-speaking breaks as needed; investigated two relay services; performed an ergonomic evaluation of Ehlers's workstation; purchased, installed, and adjusted ergonomic equipment; approved full-time, non-FMLA leave; and set up the TTS software.  When viewing all of the University's conduct over the relevant period—and not just Anderson's letter—it is evident that the University "'ben[t] over backwards to accommodate'" Ehlers.  *Faidley*, 889 F.3d at 943 (quoting *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995)).

The University's response was not perfect.  But the University was not required to provide Ehlers with a perfect accommodation or with her preferred accommodation, but only with a reasonable accommodation.  *See Huber*, 486 F.3d at 484 ("[A]n employer is not required to provide a disabled employee with an accommodation that is ideal from the employee's perspective, only an accommodation that is reasonable."); *Rehrs*, 486 F.3d at 359 ("[A] disabled individual is not entitled to an accommodation of [her] choice.").  The Court finds that up until March 2017—when it first became apparent that Ehlers could not be accommodated because of her newly disclosed diagnoses—the University reasonably accommodated Ehlers's disability.

As to the duty to engage in the interactive process:  An employer fails to engage in the interactive process when "the employer knows of the employee's disability; the employee requests accommodations or assistance; the employer does not in good faith assist the employee in seeking accommodations; and the employee could have been reasonably accommodated but for the employer's lack of good faith."  *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045 (8th Cir. 2005).  "There is no *per se* liability under the ADA if an employer fails to engage in an interactive process, but '[such a] failure . . . is *prima facie* evidence that the employer may be acting in bad faith.'"  *Kallail v. Alliant Energy Corp. Servs.*, 691 F.3d 925, 933 (8th Cir. 2012) (quoting *Fjellestad*, 188 F.3d at 952).

Anderson's letter rejecting Ehlers's request for non-speaking breaks did not represent a "breakdown in the interactive process." *Kratzer*, 398 F.3d at 1045. Instead, it was just one of the University's numerous responses to Ehlers's numerous complaints and demands. The record reflects that, the same day that the rejection letter was sent, Fuecker proposed scheduling a meeting with Ehlers to discuss accommodations. Benrud Decl. Ex. 22. At the meeting, Ehlers suggested using a relay service, and the University agreed to investigate her suggestion. *Id.* Ex. 24.

The interactive process is not a rigid back-and-forth exercise, but rather is "informal and flexible, enabling both employer and employee to identify the employee's limitations and accommodations." *Kratzer*, 398 F.3d at 1045. Anderson's letter was a response to Dr. Koch's statement that Ehlers's restrictions were "expected to be permanent" and that he was unaware "of any technology that would replace" Ehlers's voice, which understandably led the University to conclude that she could not be accommodated. Benrud Decl. Ex. 19. But after Ehlers supplied additional information about possible accommodations, the University continued to engage in good faith in the interactive process. Indeed, the Court cannot think of a case in which an employer and an employee communicated more about the employee's disability and possible accommodations.

-43-

In short, the evidence in the record does not support a finding that the University

failed to engage in the interactive process.[16]  Ehlers's counsel acted wisely in

abandoning this claim.

### D.  Discrimination

Ehlers next claims that she was discriminated against on account of her disability

in violation of the ADA.  Although her briefs make a range of arguments, Ehlers

clarified at the hearing that the only discrimination claim that she is pursuing is her

claim regarding the reclassification of the six employees at OSHB.[17]

### 1.  *McDonnell Douglas* Burden-Shifting

Ehlers does not have direct evidence of discrimination, and thus this Court must

apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

(1973).[18]  Under *McDonnell Douglas*, the plaintiff must first establish a prima facie case

---

[16]Even if the University had failed to engage in the interactive process, there is no evidence that Ehlers "could have been reasonably accommodated but for the employer's lack of good faith."  *Kratzer*, 398 F.3d at 1045; *see also Faulkner v. Douglas Cnty. Neb.*, 906 F.3d 728, 733–34 (8th Cir. 2018) (holding that an employer cannot be held liable for failing to engage in the interactive process if no reasonable accommodation was available).

[17]Ehlers's concession was well-advised, as none of her other discrimination claims would have survived the University's summary-judgment motion.

[18]Ehlers argues that the Court should instead follow the analysis outlined in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), which applies when a plaintiff produces direct evidence of discrimination.  Ehlers claims that she has the following direct

(continued...)

by showing:  "(1) that the plaintiff has a disability within the meaning of the ADA;

(2) that [she] is qualified to perform the essential functions of the job, with or without

reasonable accommodation; and (3) that [she] suffered an adverse employment action

due to a disability."  *Chalfant v. Titan Distrib., Inc.*, 475 F.3d 982, 988 (8th Cir. 2007)

(quotation omitted) (quoting *Wenzel v. Mo.-Am. Water Co.*, 404 F.3d 1038, 1040 (8th Cir.

2005)); *see also Webb v. Mercy Hosp.*, 102 F.3d 958, 959–60 (8th Cir. 1996).

After the plaintiff establishes a prima facie case, the burden of production shifts

to the defendant to produce evidence that the adverse employment action was taken for

a legitimate, nondiscriminatory reason.  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502,

---

[18](...continued)
evidence of discrimination:  her transfer to OSHB, the September 2016 denial of her
request for reasonable accommodation, the change in her duties after FMLA leave, and
the University's refusal to give her a part-time schedule.  Pl.'s Mem. Supp. Summ. J.
17–19.  None of these actions are direct evidence of discrimination, however, because
none of them "clearly point[] to the presence of an illegal motive."  *Griffith v. City of Des
Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  There is no "causal link" between these actions
and any evidence indicating a disability bias.  *Id.*

In her reply brief, Ehlers argues that an April 2015 comment from Ojwang that
Ehlers should "sew up [her] mouth" and an undated email in which either Lorna
Chambers or Neal Binsfeld sarcastically remarked that the University should "put a
chip in [Ehlers] to translate her thoughts to writing so she does not need to speak at all"
are both direct evidence of discrimination.  Fondungallah Decl. Exs. 8, 50.  But these are
"nothing more than stray remarks in the workplace, because no evidence link[s] the
remarks to the challenged employment decision."  *Deneen v. Nw. Airlines, Inc.*, 132 F.3d
431, 436 (8th Cir. 1998) (citing *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir.
1995)).  These two comments were not "made contemporaneously and directly in
connection with the adverse employment decision"—the failure to reclassify
Ehlers—and thus do not provide direct evidence of discrimination.  *Id.*

506–07 (1993).  "Then, in order to prevail, the plaintiff must show that the employer's

stated reason was in fact pretextual," by introducing evidence that the stated reason is

false and the real reason is discrimination.  *Christopher v. Adam's Mark Hotels*, 137 F.3d

1069, 1072 (8th Cir. 1998).

### a.  Ehlers's Prima Facie Case

Ehlers cannot establish a prima facie case of discrimination.  Ehlers satisfies the

first element, as the parties agree that Ehlers has a disability within the meaning of the

ADA.  Ehlers also satisfies the second element.  "[W]hether a plaintiff is qualified is

measured at the time of the adverse employment action . . . ."[19]  *Duello v. Buchanan Cnty.*

*Bd. of Supervisors*, 628 F.3d 968, 972 (8th Cir. 2010).  At the time that Ehlers returned

from FMLA leave, it appeared that she could be accommodated at OSHB because she

had not yet reported any limitation on her ability to type.  She was therefore able to

perform her job at OSHB with reasonable accommodation.

The adverse employment action that Ehlers identifies to satisfy the third element

(as clarified at the hearing) is her failure to be reclassified along with the other

employees.  "An adverse employment action is defined as a tangible change in working

conditions that produces a material employment disadvantage, including but not

---

[19]For this reason, Ehlers's argument that her termination was discriminatory fails.
When the University terminated Ehlers in April 2017, Ehlers could not perform the
essential functions of the OSHB position, with or without accommodation.

limited to, termination, cuts in pay or benefits, and changes that affect an employee's

future career prospects . . . ." *Jackman v. Fifth Jud. Dist. Dep't of Corr. Servs.*, 728 F.3d 800,

804 (8th Cir. 2013). Here, the University's reclassification of certain positions at

OSHB—but not Ehlers's position—put Ehlers at a "disadvantage" when compared to

the reclassified employees. *See Ledbetter v. Alltel Corp. Servs.*, 437 F.3d 717, 722–24 (8th

Cir. 2006) (finding employee stated prima facie case of race discrimination based on

failure to reclassify); *Orahood v. Bd. of Trs. of Univ. of Ark.*, 645 F.2d 651, 655–57 (8th Cir.

1981) (considering failure-to-reclassify claim in Title VII context).

Ehlers's prima facie claim fails, however, because there is not a shred of evidence

that the University's decision to reclassify some OSHB employees but not others

(including Ehlers) had anything to do with Ehlers's disability. *See Allen v. Interior*

*Constr. Servs.*, 214 F.3d 978, 982 (8th Cir. 2000) (requiring causal connection between

adverse employment action and disability). Ehlers argues that leaving her out of the

reclassification provides evidence of discrimination because the six reclassified

employees were similarly situated. There are two problems with this argument: First,

as discussed below, the reclassified employees were not similarly situated to Ehlers.

And second, evidence that Ehlers was treated less favorably than similarly situated

employees does not provide evidence that the University acted out of animus toward

the disabled unless none of the similarly situated employees were disabled. If one or

more of the reclassified employees were disabled, then the University could not have been motivated by disability in deciding to reclassify the positions of some—but not all—disabled employees.

As Ehlers confirmed at the hearing, she has no idea whether any of the reclassified employees are, like her, disabled.  The record includes the names, old and new classifications, and date of reclassification for five of the six employees, but no evidence as to whether any of those employees are disabled.  Fondungallah Decl. Ex. 23. Ehlers has not shown that the University's failure to reclassify her was related to her disability, and thus she cannot establish a prima facie case.

*b.  Pretext*

Even if Ehlers had established a prima facie case, the Court would dismiss her discrimination claim because she has no evidence that the University's explanation for reclassifying the six employees is pretextual.

According to the University, competition drove its decision.  The reclassified employees had positions originally in the 1888, 1858, and 1897[20] job classifications, while Ehlers's position was in the 1885 classification.  Boynton was having trouble retaining employees in the 1888, 1858, and 1897 classifications due to competition from the

---

[20]The second Siqueiros Declaration lists the job classifications of the reclassified positions as 1888 and 1858, while the answers to Ehlers's request for admissions lists them as 1888 and 1897.  *Compare* Siqueiros Decl. II ¶¶ 3–5, *with* Fondungallah Decl. Ex. 23.

private sector, but it was not having trouble retaining employees in the 1885

classification.  Ojwang Decl. ¶ 6.  The University also has submitted evidence that this

reclassification process started in 2014—long before Ehlers was transferred to OSHB.

*Id.*; Siqueiros Decl. II ¶ 5.

Ehlers has no evidence that the University's legitimate, non-discriminatory

explanation for its decision is pretextual.  Ehlers again attempts to demonstrate pretext

by claiming disparate treatment between her and the six reclassified employees.  *See*

*Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005) (discussing disparate

treatment as one way to show pretext), *abrogated on other grounds by Torgerson*, 643 F.3d

at 1043.  Once again, Ehlers's disparate-treatment claim fails because she has no

evidence about whether any of the six reclassified employees is disabled.

Even if Ehlers had evidence that none of the reclassified employees is disabled,

the Court would reject her claim because Ehlers and the reclassified employees were

not similarly situated "in all relevant respects."  *Id.*  Ehlers and the reclassified

employees had different job classifications, different job titles, and different job duties.

Fondungallah Decl. Ex. 23; Siqueiros Decl. II ¶¶ 3–5.  Ehlers argues that the reclassified

employees were similarly situated to her because, like her, they answered phone calls

from customers.  *See* Ehlers Dep. II 115:4–20, 126:6–128:1.  But the record reflects that the

reclassified employees had other duties—duties that Ehlers did not have—such as

educating students and staff, responding to more complex customer inquiries, and

inputting account creation and termination paperwork.  Siqueiros Decl. II ¶ 6.

"At the pretext stage of the *McDonnell Douglas* burden-shifting framework, the

test for determining whether employees are similarly situated . . . is a rigorous one."

*Rodgers*, 417 F.3d at 853.  Ehlers's pretext claim cannot survive this rigorous test.[21]

Having found that Ehlers has failed to establish a prima facie case and that she also has

failed to show that the University's reason for its reclassification decisions was

---

[21]Ehlers also argues that the University's denial of her request for a part-time schedule was discriminatory.  The University responds that Ehlers's full-time position could not be converted to a part-time position without unreasonably burdening the other employees.  Ehlers says that this explanation is pretextual because another OSHB employee, Jack Waibel, was allowed to work part time.

There are many problems with Ehlers's argument.  First, the disparate treatment of Waibel does not provide evidence of discriminatory animus unless he was outside of Ehlers's protected class (i.e., not disabled), *see Cody v. Prairie Ethanol, LLC*, 763 F.3d 992, 998 (8th Cir. 2014), and the record does not indicate whether Waibel had a disability. The only evidence relevant to this issue is Ehlers's inconclusive testimony that she "believe[d] Jack to not have a disability."  Ehlers Dep. II 222:6–7.  Second, Waibel is not a suitable comparator because Waibel and Ehlers were not similarly situated.  Waibel was a Principal Accounts Specialist, and thus had a different job.  Ojwang Decl. II ¶ 4; *see E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 970 (8th Cir. 2014) (noting "employees used for comparison must be 'similarly situated in all relevant respects'" to the plaintiff (citation omitted)).  Third, Waibel requested a part-time schedule for a definite period while he finished school; he subsequently returned to full-time work.  Ojwang Decl. II ¶ 4; Fondungallah Decl. Ex. 48.  In contrast, Ehlers requested an indefinite part-time schedule, as she did not know whether her evolving medical restrictions would ever allow her to return to a full-time schedule.  Finally, a part-time schedule would not have accommodated Ehlers's disability, as she conceded at the hearing.  Ehlers's job required a lot of talking or a lot of typing, and she could do neither (full-time or part-time).

-50-

pretextual, the Court grants summary judgment to the University on Ehlers's disability-discrimination claim.

### E. Retaliation

Ehlers finally argues that the University retaliated against her for exercising her rights under the ADA.  Ehlers has no direct evidence of retaliation, and thus the *McDonnell Douglas* burden-shifting framework again applies.  *See E.E.O.C. v. Prod. Fabricators, Inc.*, 763 F.3d 963, 972 (8th Cir. 2014); *Kratzer*, 398 F.3d at 1048 (citing *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir. 1980)).  Ehlers must establish a prima facie case by showing that "(1) she engaged in a statutorily protected activity, (2) the [University] took an adverse action against her, and (3) there was a causal connection between the adverse action and the protected activity."  *Hill v. Walker*, 737 F.3d 1209, 1218 (8th Cir. 2013).  If Ehlers establishes a prima facie case, the burden shifts to the University to provide a legitimate, nondiscriminatory reason for the adverse employment action.  *Kratzer*, 398 F.3d at 1048.  If the University does so, Ehlers must demonstrate that the University's reason is pretextual.  *Id.*

Ehlers points to three separate instances of alleged retaliation:  her transfer to OSHB, the University's failure to accommodate her disability, and the change in her duties after she returned from FMLA leave.  The Court addresses each in turn.

#### 1.  Transfer to OSHB

Ehlers first argues that her October 2015 transfer to OSHB was retaliatory.  Her

claim fails for two reasons.  First, Ehlers's transfer to OSHB is not actionable, because it

occurred well outside of the limitations period.  Second, Ehlers cannot establish a prima

facie case.

In order to have a viable retaliation claim *under the ADA*, Ehlers must first engage

in conduct *protected by the ADA* and then suffer retaliation on account of such conduct.[22]

*See Foster v. Time Warner Ent. Co.*, 250 F.3d 1189, 1194 (8th Cir. 2001) ("The ADA

prohibits discrimination against an individual because that individual opposed any act

or practice made unlawful by it[.]" (cleaned up) (quotation and citation omitted)).

Indeed, a plaintiff "cannot show that [she] engaged in a statutorily protected activity

without first demonstrating that [she] had a good faith reasonable belief that the alleged

retaliator was engaging in discriminatory activity."  *Amir v. St. Louis Univ.*, 184 F.3d

1017, 1025 (8th Cir. 1999).

It appears that, prior to being transferred to OSHB, Ehlers made three complaints

against her supervisor or Boynton:  one alleging that her supervisor was impaired at

work, one alleging that someone at Boynton violated HIPAA by leaving patient

---

[22]The ADA prohibits retaliation for making a charge under the ADA; the statute does not prohibit retaliation for making a charge under another statute.  *See* 42 U.S.C. § 12203(a) ("No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful *by this chapter* or because such individual made a charge . . . *under this chapter*." (emphasis added)).

information in an exam room, and one alleging that her supervisor violated the Fair

Labor Standards Act.  *See* Benrud Decl. Exs. 8, 10; Ehlers Dep. 65:17–21; Ehlers Dep. II

72:10–23.  Ehlers has not been consistent in explaining which of these complaints she

believes led to her transfer to OSHB.  It does not matter, though, because none of these

complaints involved activity that was protected by the ADA.  Thus, even if the

University retaliated against Ehlers for making these complaints by transferring her to

OSHB, the University did not retaliate against Ehlers *in violation of the ADA.  See Oehmke*

*v. Medtronic, Inc.*, 844 F.3d 748, 758 (8th Cir. 2016) ("A retaliation claim under the ADA

requires a but-for causal connection between the employee's assertion of her ADA

rights and an adverse action by the employer.").

### 2.  Denial of Reasonable-Accommodation Request

Ehlers next argues that when the University *denied* her request for reasonable

accommodation, the University retaliated against her for *making* a request for

reasonable accommodation.  The flaw in this argument is obvious:  If every denial of a

request for reasonable accommodation gave rise to a claim for retaliation, then every

denial of a request for reasonable accommodation would give rise to two claims:

a claim for failing to reasonably accommodate and a claim for retaliating.  *See McClain v.*

*Tenax Corp.*, 304 F. Supp. 3d 1195, 1206 (S.D. Ala. 2018) ("[T]he mere denial of a request

for a reasonable accommodation cannot be an adverse employment action giving rise to

a separate ADA retaliation claim.  Were the law otherwise, every time an employee was

denied a requested accommodation, [she] would be able to 'double dip' by asserting

both ADA failure-to-accommodate and ADA retaliation claims."); *Floyd v. Lee*, 968 F.

Supp. 2d 308, 334 (D.D.C. 2013) ("[I]f the denial of a request for accommodation could

itself support a claim of retaliation based on the request, then every failure-to-

accommodate claim would be doubled.").

The Court has already held that the University did not deny reasonable

accommodation to Ehlers.  Even if the University had denied reasonable

accommodation, however, it could be held liable only for denying reasonable

accommodation, and not also for retaliating by denying reasonable accommodation.

### 3.  Post-FMLA-Leave Change in Duties

Finally, Ehlers argues that the change in her duties following her FMLA leave

was in retaliation for her taking the leave.[23]  Ehlers's FMLA leave is protected activity

under the ADA, because the leave was provided as an accommodation of her disability.

*See Evans v. Coop. Response Ctr., Inc.*, No. 18-302 ADM/BRT, 2019 WL 2514717, at *6

(D. Minn. June 18, 2019) ("Requesting FMLA leave has been recognized as protected

---

[23]Ehlers also argues that the reclassification of the six OSHB employees was done in retaliation for her taking FMLA leave.  This argument fails for the same reason it failed as part of her disability-discrimination claim:  The six employees are not suitable comparators, and there is zero evidence that the University's nondiscriminatory explanation for reclassifying the employees (to respond to private-sector competition) is pretextual.

activity under the ADA."), *appeal docketed*, No. 19-2483 (8th Cir. July 16, 2019); *see also*

*Kirkeberg v. Canadian Pac. Ry.*, 619 F.3d 898, 907–08 (8th Cir. 2010) (requesting reasonable

accommodation is a protected activity).

      As explained above, to establish a prima facie case of retaliation, Ehlers must

show, among other things, that "the employer took an adverse action against her."  *Hill*,

737 F.3d at 1218.  The "adverse employment action must have been serious enough to

dissuade a reasonable worker, not just [Ehlers] herself, from engaging in protected

conduct."  *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 943 (8th Cir. 2019) (cleaned up)

(quotation and citation omitted).

      Ehlers contends that the change in her duties following FMLA leave was an

adverse employment action.  But the changes in her duties were minimal, and certainly

not enough to dissuade a reasonable worker from engaging in protected activity.

      At the request of Ojwang, Ehlers created a chart comparing her duties before and

after FMLA leave.  The chart indicated that what Ehlers herself characterized as the

"[p]rimary function" of her position—answering the phone—had not changed.  The

only changes were that, after FMLA leave, Ehlers was lower in line for assisting walk-in

customers, she gained some non-speaking work (the responsibility of data entry for the

GAHP accounts), and she lost some other non-speaking work.  These changes are

-55-

trivial, and "retaliation cannot be trivial; it must produce some 'injury or harm.'"
*Littleton v. Pilot Travel Ctrs., LLC*, 568 F.3d 641, 644 (8th Cir. 2009) (citation omitted).

Ehlers complains that working on the GAHP accounts required her to learn a new set of accounts while on a reduced schedule.  *See* Benrud Decl. Ex. 25.  But just about every employee of just about every organization has to learn new tasks from time to time.  Working on GAHP accounts was a small part of Ehlers's job, and the added responsibility did not affect her overall performance.  *See* Fondungallah Decl. Ex. 26 (showing Ehlers continued to meet expectations in a December 5, 2016 performance appraisal).  The fact that Ehlers did not want to work on the GAHP accounts is irrelevant; an "action is not adverse simply because it is upsetting or disappointing to an employee."  *Garrison*, 939 F.3d at 943 (quotation and citation omitted).

For these reasons, the Court grants summary judgment to the University on Ehlers's retaliation claims.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,
IT IS HEREBY ORDERED THAT:

1.    Defendant's motion for summary judgment [ECF No. 61] is GRANTED.

2.    Plaintiff's motion for summary judgment [ECF No. 80] is DENIED.

3.      Plaintiff's complaint [ECF No. 1] is DISMISSED WITH PREJUDICE AND

ON THE MERITS.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 19, 2021                    s/Patrick J. Schiltz
                                             Patrick J. Schiltz
                                             United States District Judge